UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America

- against -

John Gammarano and William Scotto,

                                    Defendants.

----------------------------------------X

CR-06-0072 (CPS)

MEMORANDUM OPINION
AND ORDER

SIFTON, Senior Judge.

Defendants John Gammarano and William Scotto were indicted

on November 30, 2006[1] and charged with one count of racketeering,

in violation of 18 U.S.C. § 1962(c),[2] one count of racketeering

conspiracy, in violation of 18 U.S.C. § 1962(d),[3] and one count

of securities fraud conspiracy, in violation of Securities and

_____

[1] The indictment was unsealed on December 12, 2006.

[2] The statute reads:

It shall be unlawful for any person employed by or associated with
any enterprise engaged in, or the activities of which affect,
interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity or collection
of unlawful debt.

18 U.S.C. § 1962(c). The predicate acts constituting the pattern of
racketeering activity are described below.

[3] The statute reads: "It shall be unlawful for any person to conspire to
violate any of the provisions of subsection (a), (b), or (c) of this section."
18 U.S.C. § 1962(d).

Exchange Commission Rule 10b-5 (17 CFR § 240.10b-5),[4] 15 U.S.C. §

78j(b),[5] 15 U.S.C. § 78ff,[6] and 18 U.S.C. § 371.  Now before this

Court are (1) the government's motion for an anonymous and

partially sequestered jury; (2) defendant Scotto's motion for

---

[4] The regulation reads:

It shall be unlawful for any person, directly or indirectly, by
the use of any means or instrumentality of interstate commerce, or
of the mails or of any facility of any national securities
exchange, (a) To employ any device, scheme, or artifice to
defraud, (b) To make any untrue statement of a material fact or to
omit to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading, or (c) To engage in any act,
practice, or course of business which operates or would operate as
a fraud or deceit upon any person, in connection with the purchase
or sale of any security.

17 CFR § 240.10b-5.

[5] The statute reads, in relevant part:

It shall be unlawful for any person, directly or indirectly, by
the use of any means or instrumentality of interstate commerce or
of the mails, or of any facility of any national securities
exchange . . . (b) To use or employ, in connection with the
purchase or sale of any security registered on a national
securities exchange or any security not so registered, or any
securities-based swap agreement (as defined in section 206B of the
Gramm-Leach-Bliley Act), any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public
interest or for the protection of investors.

15 U.S.C. § 78j(b).

[6] The statute reads, in relevant part:

Any person who willfully violates any provision of this chapter .
. . or any rule or regulation thereunder the violation of which
is made unlawful or the observance of which is required under the
terms of this chapter, or any person who willfully and knowingly
makes, or causes to be made, any statement in any application,
report, or document required to be filed under this chapter or
any rule or regulation thereunder . . . which statement was false
or misleading with respect to any material fact, shall [be guilty
of a crime]."

15 U.S.C. § 78jff.

severance; and (3) both defendants' motion for production of a
bill of particulars.[7]  For the reasons set forth below, (1) the
government's motion for an anonymous and partially sequestered
jury is granted; (2) defendant Scotto's motion for severance is
denied; and (3) both defendants' motion for production of a bill
of particulars is denied.

## Background

The following facts are derived from the indictment and from
the submissions of the parties in connection with these motions.
Disputes are noted.

According to the government, defendants are members of the
Gambino crime family[8] and between them committed five predicate

---

[7] Additional pre-trial motions were made by the parties and decided at
oral argument on July 10, 2007.  Specifically, (1) I denied the government's
motion to exclude evidence about defendant Gammarano's health, but directed
defendants to make no reference to defendant's health without first making an
application to that effect; (2) I denied defendants' motion for production of
the government's witness list, which is subject to disclosure at the Pre-trial
Conference; (3) I denied defendants' request for production of a list of
recordings and trial exhibits, but ordered the government to produce draft
transcripts of the recordings by July 20; (4) the government agreed to produce
the results of tests, examinations and analysis, pursuant to defendants'
request; (5) the government agreed to preserve notes made by law enforcement
agents pursuant to defendants' request; and (6) I denied without prejudice
both parties' motions for leave to file additional motions.  I also instructed
the government that if they will seek to not disclose the identity of John Doe
at the Pre-trial Conference, they make a motion to that effect, returnable on
the date of that conference.

[8] The structure of the Gambino criminal family has been detailed in
other cases in this Circuit and in the indictment.  As the Second Circuit has
noted:

    Most of the Family's criminal activity is carried out by crews of
    'soldiers,' often with the assistance of 'associates,' who are not
    members of the Family.  Each crew is directed by a 'captain'. The
    captains, in turn, report to a 'consiglieri,' who is the

acts of racketeering between 1982 and 2003 which underlie the

three charges in the indictment.[9]

Racketeering Act One alleged in the indictment has two

parts. The first part is defendants' participation, between 1995

and 2003, in a securities fraud conspiracy organized by

associates of the Gambino family, in violation of Rule 10b-5. As

part of the conspiracy, stock was fraudulently marketed to

customers by lying about the real value of the securities and by

failing to disclose that the sellers were being paid illegal

commissions to sell the stock. Customers who purchased stock

were then prevented from selling; when the stock later dropped in

value, customers lost their investments. The indictment refers

to three overt acts committed in furtherance of this securities

fraud conspiracy: (1) between February 2000 and March 2000,

undisclosed co-conspirator #1,[10] who owned over 100,000 shares of

a company called GlobalNet, Inc., paid brokers undisclosed cash

commissions to sell shares of GlobalNet stock in order to inflate

---

third-ranking member of the Family, with responsibility for
day-to-day operations. Family rules dictate that a member may not
engage in any criminal activity without the approval of his
superior.

*U.S. v. Gallo*, 863 F.2d 185, 187-88 (2d Cir. 1988). According to the
indictment, the head of the family is the 'boss,' and an 'underboss' and the
'consiglieri' report to him; collectively, these three individuals are
referred to as the 'administration.'

[9] Defendants participation in the securities conspiracy came to light
during the testimony of Joseph Quattrochi at the 2005 trial of John A. Gotti,
described in more detail below.

[10] The identity of this co-conspirator is known to the Grand Jury.

the value of the stock; (2) in March 2003, Gammarano was paid $5,000 by undisclosed co-conspirator #2,[11] which was a portion of the proceeds from a fraudulent securities deal involving an entity known as "Jaguar"; and (3) in June 2003, Gammarano and Scotto attended a meeting at which they discussed with co-conspirator #2 and others a dispute which had arisen among the conspirators regarding the Jaguar deal. The second part of Racketeering Act One alleges defendants' participation in an extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (interference with commerce by threats or violence). According to the indictment, in 1995 Gammarano caused threats of violence to be made to John Fiero, a stockbroker whose purchases and sales of stock were frustrating the goals of the securities fraud conspiracy, by ordering Scotto to threaten violence against Fiero, which Scotto did.

Racketeering Act Two in the indictment alleges that Gammarano participated in an extortion conspiracy in 1995. According to the government, Gammarano demanded that the partners of First Hanover Securities, Inc., pay him money and threatened violence if they did not comply, in violation of 18 U.S.C. § 1951(a). This demand was the culmination of a dispute that one of the First Hanover partners had with another individual who was 'backed' by organized crime figures.

---

[11] The identity of this co-conspirator is known to the Grand Jury.

Racketeering Act Three alleges that Scotto attempted to extort John Doe[12] in 1994 and then assaulted John Doe after John Doe refused Scotto's demand to pay him money, in violation of 18 U.S.C. § 1951(a).  According to the government, a member of the Gambino organization subsequently told John Doe not to tell the truth about the incident.

Racketeering Act Four in the indictment alleges that Gammarano participated in a conspiracy between 1988 and 1991, which extorted money from DeLuxe Homes of Pennsylvania, Inc. with respect to work at three different job sites.  The conspiracy was allegedly a joint effort by five organized crime families in New York with Gammarano representing the Gambino family's interests. According to the indictment, DeLuxe's consent to pay money was to be induced through threats of violence, in violation of 18 U.S.C. § 1951(a).  In 1995, Gammarano admitted during a guilty plea that he had conspired to extort money from DeLuxe Homes.

Racketeering Act Five in the indictment alleges that Gammarano used extortion to collect on an extension of credit in 1982, when he met with George Foronjy, an individual who was having trouble repaying a debt, and made "veiled threats" regarding his failure to repay the loan, in violation of 18 U.S.C. § 894(a)(1) (collection of extensions of credit by extortionate means).  In 1993, Gammarano admitted during a guilty

---

[12] John Doe's identity is known to the Grand Jury.

plea that he had met with Foronjy in order to pressure him to make payments on the loan.

*Gambino Family's History of Obstruction of Justice*

The government cites several cases to demonstrate that the Gambino crime family has frequently engaged in jury and witness tampering.

The first case cited by the government is *U.S. v. Gotti*, No. 85-CR-0178, in which John Gotti, Jr., the alleged head of the Gambino family, and several co-defendants were tried on racketeering charges. After an anonymous jury was selected, juror George Pape conspired with members of the Gambino family to secure Gotti's acquittal.[13] Pape was later convicted of obstruction of justice. *See U.S. v. Radonjich,* 1 F.3d 117 (2d Cir. 1993).

The government also cites *U.S. v. Gotti*, No. 02-CR-0606, a multi-defendant case in which two members of the Gambino family were convicted of witness tampering. According to the government, the evidence in that case demonstrated that defendant Anthony Ciccone, a Gambino captain, ordered defendant Primo Cassarino, a soldier in his 'crew', to instruct a witness to take the fifth and refuse to testify before the Grand Jury since his

---

[13] In that case, Pape contacted a member of Gambino family whom he knew from before the trial.

testimony would not have been favorable to Ciccone.  According to the government, another witness who testified before the Grand Jury recanted his testimony at trial and explained, after later being indicted for perjury (*U.S. v. Molfetta*, No. 04-CR-0453), that he had received calls after his Grand Jury testimony from people he believed were associates of the defendants and that he feared for his life.

In *U.S. v. Ambrosio*, No. 03-CR-0725, a prosecution against Gambino family members on loansharking charges, one of the defendants visited a witnesses, who was a victim of the loansharking activity, and told the witness that, should he be called to testify, he should testify that the loan he received was not from defendants.  The witness told the defendant that he understood and subsequently left the country until after the case was resolved.

During the second retrial of Gene Gotti, a Gambino family soldier offered a juror $25,000 to vote for acquittal.[14] *See U.S. v. Ruggiero*, 83-CR-0412.  That juror later informed the court that he felt threatened after two men appeared at his house and asked him about his participation in the trial, after which he

---

[14] Gene Gotti's first two trials ended in mistrials, and the first mistrial was the result of suspected jury tampering, as discussed below with regard to Gammarano.

was dismissed from the jury.[15]

The government also notes that a defense attorney not involved in this case was indicted in 2005 for helping an alleged Gambino associate engage in threatening and bribing witnesses, both during the Grand Jury phase and at trial. *See U.S. v. Bronson*, No. 05-CR-0714.[16]

*Defendant Gammarano's History of Jury Tampering*

According to the government, defendant Gammarano himself participated in a scheme to influence jurors during the prosecution of Gene Gotti. The first trial in that prosecution resulted in a mistrial after the government learned that Mel Rosenberg, a friend of Gene Gotti, had been tampering with the jury. *See U.S. v. Ruggiero*, 678 F.Supp 46 (E.D.N.Y. 1988) ("*Ruggiero I*").[17] In that case, Rosenberg called an individual he knew personally and believed to be a juror[18] and arranged a meeting. During that meeting, Rosenberg explained that he was a friend of the Gotti family and offered to buy that juror a new

---

[15] The government cites to *U.S. v. Ruggiero,* 928 F.2d 1289 (2d Cir. 1991) ("*Ruggiero II*"). However, while that case discusses the dismissal of a juror who felt threatened after men appeared at his house, it does not discuss an attempted bribe of that juror, nor is it clear who the men who appeared at the juror's house were.

[16] This case has not yet gone to trial.

[17] There was also testimony that defendants used private investigators to identify anonymous jurors by their license plates.

[18] In fact, that person had been selected as juror but was then dismissed two days before Rosenberg contacted him.

car if he would provide insight into the jury's inclinations.
The juror refused the offer.  According to the government,
Rosenberg called Gammarano and reported on the failed bribe and
Gammarano later helped Rosenberg find legal representation when
he was served with a Grand Jury subpoena.  According to the
government, taped conversations that took place after Gene Gotti
was convicted confirm Gammarano's involvement.  Specifically, in
December 1989, John Gotti told Frank Locascio that "[Johnny G.]'s
one of the reasons Genie's in jail," which the government says is
a reference to the failed bribe.[19]  Defendant Gammarano says that
he was involved in no such attempt to bribe a juror, noting that
Gammarano himself was never charged with any wrongdoing and that
the comment by John Gotti is taken out of context and cannot be
credited as evidence of Gammarano's involvement.  In addition,
defendant points out that the only established connection between
Gammarano and Rosenberg is that they share an attorney, who
Gammarano supposedly referred to Rosenberg.  Defendant further
notes that Rosenberg was acquitted at trial.

According to the government, Gammarano has also demonstrated
his disregard of the judicial process by violating the terms of
his supervised release[20] when he made false statements to the
Probation Department about his employment status and income in

---

[19] Johnny G. is one of Gammarano's aliases.  The government has not
provided a copy or transcript of this recording.

[20] Gammarano was in prison on extortion and tax charges.

early 2000, resulting in the revocation of his supervised

release.[21] *See U.S. v. Gammarano*, No. 93-CR-0506.


## Discussion

I. Anonymous and Partially Sequestered Jury

The government has moved for an anonymous and partially

sequestered jury.  Specifically, the government has requested

that (1) the identities of prospective jurors (including names,

addresses and places of employment) not be revealed to either of

the parties or their attorneys; (2) the jurors, from the time the

jury is empaneled until the conclusion of the trial, be escorted

by U.S. Marshals to and from the courthouse each day and during

all recesses.

"Empaneling an anonymous [and sequestered] jury . . . has

serious implications for a defendant's interest in effectively

conducting voir dire and in maintaining the presumption of

innocence." *U.S. v. Wong*, 40 F.3d 1347, 1376 (2d Cir. 1994); *see

also U.S. v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991) ("[T]he

---

[21] Defendant argues that the district court did not find that Gammarano had made a false statement but rather found that although defendant had truthfully reported his employment activity, that employment did not satisfy the conditions of his release.  However, a transcript of the district court's hearing on that matter reveals that the court found that the defendant violated the terms of his supervised release "by failing to work regularly at a lawful occupation, by failing to report truthfully and completely to the probation officer . . . and by failing to answer truthfully to the probation officer's inquiries regarding his employment." Transcript of Record at 54, *U.S. v. Gammarano*, No. 93-CR-0506 (Oct. 19, 2000). The Second Circuit's opinion on a separate matter refers to the district court's 2000 finding that "Gammarano had violated the conditions of his supervised release by submitting false monthly reports." *U.S. v. Gammarano*, 321 F.3d 311, 313 (2d Cir. 2003).

empaneling of an anonymous jury and its potential impact on the constitutionality of a trial must receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense."). The Second Circuit has ruled that the use of an anonymous jury is appropriate where (1) there is "strong reason" to believe that the jury needs protection and (2) reasonable precautions are taken to limit any prejudicial effects on the defendants and insure that their fundamental rights are protected. *U.S. v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *see also Wong*, 40 F.3d at 1376; *U.S. v. Barnes*, 604 F.2d 121, 141 (2d Cir. 1979). Within those parameters, the decision whether or not to empanel an anonymous jury is within the discretion of the district court. *See Paccione*, 949 F.2d at 1192.

Anonymous juries are empaneled in order to protect jurors from harm, to address concerns of jurors regarding their safety, and to prevent potential jury tampering. *See U.S. v. Persico,* 1994 WL 150837, at *2 (E.D.N.Y. 1994); *U.S. v. Locascio,* 357 F.Supp.2d 558, 561 (E.D.N.Y. 2005). In deciding whether there is reason to empanel an anonymous jury, factors to be considered include (a) the seriousness of the present charges; (b) the dangerousness of the defendant; (c) evidence of previous attempts by defendant or his associates at jury tampering or interference with the judicial process; (d) the ability of defendant or his associates to harm jurors or otherwise interfere with the

judicial process; and (e) the amount of publicity expected during
the trial "that might expose the jurors to extraordinary
pressures that could impair their ability to be fair." *U.S. v.
Cacace*, 321 F.Supp.2d 532, 534 (E.D.N.Y. 2004) (citations
omitted); *see also Paccione*, 949 F.2d at 1192.[22]  I will now
address these factors in turn.

*Seriousness of the Charges*

Defendant Gammarano is 66 years old, and in ill health, and
defendant Scotto is 40 years old.  Each defendant faces a maximum
term of imprisonment of 20 years on each of these charges.  The
possibility of long sentences for defendants, who are not young
men, provides some motive to tamper with the jury. *See Locascio,*
357 F.Supp.2d at 561 ("None of the defendants are young men, and
the substantial prison terms and financial penalties they face
provide a motive to tamper with the jury.").  In addition, while

---

[22] Although courts not infrequently order anonymous and sequestered
juries in organized crime cases, the decision to take such precautions cannot
turn merely on the fact that the government alleges that a defendant is part
of criminal organization. As the Second Circuit said in *Vario*:

The invocation of the words "organized crime," "mob," or "Mafia,"
unless there is something more, does not warrant an anonymous
jury.  This "something more" can be a demonstrable history or
likelihood of obstruction of justice on the part of the defendant
or others acting on his behalf or a showing that trial evidence
will depict a pattern of violence by the defendants and his
associates such as would cause a juror to reasonably fear for his
own safety. Such proof would be sufficient in and of itself in an
appropriate case to warrant an anonymous jury regardless of
whether the defendant was a reputed mobster or associated with a
recognized organized crime family.

943 F.2d at 241.

some of the charges revolve around defendants' participation in a securities fraud conspiracy,[23] which is normally a "nonviolent charge" as defendants contend, the indictment alleges several predicate acts of violence and threatened violence by defendants in furtherance of that conspiracy. Thus, the seriousness of the present charges weighs in favor of anonymity.

*Dangerousness of Defendants*

Both defendants have threatened unspecified violence in furtherance of criminal aims over the last 25 years, according to the indictment. However, according to the indictment, only one such threat has actually been carried out and that over 10 yeas ago. This relatively limited history of defendants' violence is not, itself, something that should make a jury or a court concerned for the jury's safety.

*Attempts and Ability to Interfere with the Judicial Process*

The government's claim that Gammarano was previously personally involved in jury tampering is not very convincing. The government's only evidence that he was involved in attempting to influence jurors in the Gene Gotti case is a cryptic comment from a recorded conversation indicating that he was somehow

---

[23] Contrary to defendants assertion, many of the racketeering acts alleged have nothing to do with the securities fraud conspiracy.

partly responsible for Gene Gotti's conviction, a comment which
fails to demonstrate that Gammarano was involved in any plot to
influence jurors.  Gammarano's false representation to his
probation officer in 2002 is of tangential significance in
evaluating the likelihood that he may tamper with a jury.

That said, the government has provided evidence of a
significant number of well-publicized previous attempts by
members of the Gambino crime family to undermine the judicial
process by intimidating witnesses and identifying jurors to
influence or intimidate, and courts in this district have
recognized that such a history of obstruction of justice exists.
*See Locascio*, 357 F.Supp.2d at 562 (Gambino family members "have
a documented history of seeking to tamper with juries and []
could provide the support necessary to achieve that objective.").
Some of these efforts have been successful, demonstrating the
Gambino family's ability to interfere with the judicial
process.[24]  In particular, as noted above, there was evidence in
*Ruggiero I* that investigators were hired to take down license
plate numbers of anonymous jurors and match those to the names of
the car owners, presumably in order to identify and approach
those jurors outside the courtroom.  In addition, according to

---

[24] Though the government has yet to prove that Gammarano and Scotto are
members of the Gambino crime family, I may accept the Grand Jury's findings on
this matter as true for the purposes of this motion, particularly since
defendants have offered no evidence to contradict it. *See Locascio*, 357
F.Supp.2d.

the indictment, there has already been one attempt to protect Scotto by obstructing justice when John Doe was warned by an associate of the Gambino family not to tell the truth about the assault. Further, as discussed below, evidence of the Gambino family's violent history from 1982 to 1992, including evidence of murders committed during the ascendency of John A. Gotti, will likely be introduced at trial, which may cause jurors to be concerned for their safety.

While it is not uncommon for courts to be concerned that organized crime families with demonstrated histories of obstruction of justice will intercede on behalf of their members, it is also necessary to evaluate whether, given the relative importance of the defendant in the hierarchy, such a concern is warranted in a particular case. *See U.S. v. Mora*, 1995 WL 519987, at *4 (E.D.N.Y. 1995) (discussing gang members and finding that "defendants are simply not of the same character as those whose power, prominence, and public presence would have warranted substantial jury protection."); *U.S. v. Fortunato,* 2002 WL 31946813, at *1 (E.D.N.Y. 2002) (Citing *Mora* in discussing "associates" who were not "made" members of the crime family). According to the indictment, both defendants are "made" members of the Gambino crime family. Though Gammarano's current rank in the hierarchy is not clear, he has been ranked as high as an "acting captain," and Scotto is a soldier in his 'crew'.

Although neither defendant is a particularly high-ranking member of the organization, the likelihood that the someone would attempt to interfere with a jury on their behalf is still a factor to be considered, especially among members of Gammarano's 'crew' or others in the organization who have reason to be concerned that the result of the trial will put them at risk for prosecution.[25] *See Locascio*, 357 F.Supp.2d at 562 (Defendant, a soldier in the Gambino crime family, had "strong and influential ties" to the family sufficient to concern the court that the Gambino family may assist him in tampering with a jury.).

*Publicity*

Publicity enhances the likelihood that jurors names will become public, exposing them to intimidation or harassment. *See Vario*, 943 F.2d at 240. Since it is probable that the case will receive some media attention, jurors may also feel compelled to make decisions on the basis of concerns about public scrutiny or fear, rather than on the basis of the evidence presented. *See Barnes,* 604 F.2d at 140-41

The government cites evidence that there will be significant media coverage of this case, which gives grounds for concern that the names or other identifying information about jurors will be

---

[25] Since the evidence against these two defendants originally came out during the trial of John A. Gotti, it is reasonable to infer that senior members of the Gambino family have an interest in the trial.

released to the public, resulting in pressure on jurors by persons with an interest in the outcome of the trial. The government notes that articles describing the charges have already appeared in the New York Post, Newsday, AM New York, and the Staten Island Advance.[26]

A review of the articles reveals that they are brief pieces of local news describing the charges and how the defendants' participation in the alleged securities fraud conspiracy came to light during testimony given in the 2005 trial of John A. Gotti.[27] However, the fact that Gammarano is a long-time member of the Gambino family and that both defendants are connected with the high-profile Gotti cases is likely to generate significant additional press coverage as the case progresses to trial.[28]

Balancing all these factors, and the evidence available at this time, I conclude that an anonymous and partially sequestered jury is necessary to ensure the integrity of the judicial process, while protecting the defendants' rights to a fair and

---

[26] The government also states that they believe a story was reported on the Bloomberg newswire but they do not have a copy.

[27] *Cf. Vario*, in which the Second Circuit held that the trial judge had not erred in finding that there was a possibility of significant media attention even though only one article had been written prior to the trial since that article was a Newsday cover story that "detailed the extensive nature of the conspiracy charged." 943 F.2d at 240.

[28] The government notes that an internet search results in more than 700 references to John Gammarano, many of them discussing his links to organized crime. When this search was repeated on Google.com, using the search term "'John Gammarano' OR 'Johnny Gammarano,'" there were 704 results. *See* http://www.google.com/search?hl=en&client=firefox-a&rls=org.mozilla%3Aen-US%3A official&hs=pzN&q=%22John+Gammarano%22+OR+%22Johnny+Gammarano%22&btnG=Search (last visited July 11, 2007).

impartial jury.  Accordingly, inquiry into the names of
prospective jurors, their addresses, and places of their and
their friends' and relatives' employment will be prohibited.
Their counties, towns and neighborhoods, and, where appropriate,
their type of employment will be proper subjects for voir dire.
Before the start of each day, the jurors will be picked up from
an undisclosed central location by the Marshal's Service and
driven to the courthouse, where they will be kept in the custody
of the Marshal's Service until they are returned to the
centralized location at the end of the day.  Further, the jurors
will eat lunch together in the courthouse cafeteria in rooms set
aside for juror meals. *Id.; see also Fortunato,* 2002 WL 31946813,
at *1 (E.D.N.Y. 2002) (Ordering that "[b]efore the start of each
day, the jurors will be picked up at an undisclosed central
location by the United States Marshal and transported to the
courthouse and to the jury room of the courtroom in which this
trial will be held . . . . [and] [a]t the end of each day, the
jurors will be transported by the United States Marshal from the
courthouse to an undisclosed central location from which they can
depart for their respective homes and communities."); *U.S. v.
Coffey,* 2005 WL 2245007, at *4 (E.D.N.Y. 2005) (Directing that
the "Marshal make appropriate arrangements for the transportation
of jurors from the courthouse at the end of each day.").  So as
to limit prejudice to the defendants, I will explain to the jury

that these precautions are not unusual and are in place in order
to protect their privacy. *See U.S. v. Thai* , 29 F.3d 785, 801 (2d
Cir. 1994). Pursuant to this Court's Pre-trial Order, the
parties may submit voir dire requests to ensure that they are
able to gather sufficient information about the jurors to allow
them to make an informed choice in selecting jurors for trial.
*See Barnes*, 604 F.2d at 140.


## II. Severance of William Scotto

Scotto argues that he will be substantially prejudiced by a
joint trial with Gammarano and that their trial should therefore
be severed.

Rule 14(a) of the Federal Rule of Criminal Procedure allows
a district court to sever joint trials "[i]f the joinder of
offenses or defendants in an indictment . . . appears to
prejudice a defendant." "Where . . . the defendants are accused
of participation in a common scheme, the preference for joint
trials in the federal system is especially strong," *U.S. v. Chu*,
2006 WL 1526922, at *1 (2d Cir. 2006), and "a district court
should grant a severance under Rule 14 only if there is a serious
risk that a joint trial would compromise a specific trial right
of one of the defendants, or prevent the jury from making a
reliable judgment about guilt or innocence." *Zafiro v. U.S.,* 506
U.S. 534, 539 (1993). "A motion for severance is committed to

the sound discretion of the district court," *U.S. v. Locascio,* 6
F.3d 924, 947 (2d Cir. 1993), and "'in order to prevail, the
defendant must show not simply some prejudice but *substantial*
prejudice.'" *U.S. v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004)
(emphasis in original) (quoting *U.S. v. Werner*, 620 F.2d 922, 928
(2d Cir. 1980)); *see also U.S. v. Amato*, 15 F.3d 230, 237 (2d
Cir. 1994) ("Given the balance struck by Rule 8 [permitting the
joinder of defendants when the offense are part of a common
scheme],[29] which authorizes some prejudice against the defendant,
a defendant who seeks separate trials under Rule 14 carries a
heavy burden of showing that joinder will result in substantial
prejudice.") (internal quotations omitted); *U.S. v. Carson*, 702
F.2d 351, 366-67 (2d Cir. 1983) ("[D]iffering levels of
culpability and proof are inevitable in any multi-defendant trial
and, standing alone, are insufficient grounds for separate
trials."). Moreover, much potential prejudice can be remedied
through the use of limiting jury instructions, instructing the
jury to consider each defendant individually. *See U.S. v.
Spinelli,* 352 F.3d 48, 55 (2d Cir. 2003); *but* see *U.S. v.
McDermott,* 245 F.3d 133, 139-40 (2d Cir. 2001) (Presumption the
jurors will "adhere to limiting instructions . . . . fades when
there is an overwhelming probability that the jury will be called

---

[29] Defendants do not argue that they have been impermissibly joined
under Rule 8.

upon to perform humanly impossible feats of mental dexterity.").

That said, the Second Circuit has recognized that severance may appropriate in cases of "spillover prejudice," where "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required," *Spinelli,* 352 F.3d at 55, or where "shocking or inflammatory evidence came in against co-defendants." *U.S. v. Alessi,* 638 F.2d 466, 475 (2d Cir. 1980); *see also U.S. v. Cardascia,* 951 F.2d 474, 483 (2d Cir. 1991) ("Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater.").

Scotto first argues that the indictment alleges illegal activities by Gammarano dating back to 1982, when Scotto himself was only 15 years old and 11 years before any of the illegal activities attributed to Scotto took place.  Scotto also notes that Gammarano pled guilty to the extortion charges alleged in racketeering acts four and five, and that Scotto "can only be prejudiced in a joint trial in which his codefendant has already acknowledged having committed the same type of acts with which Scotto is currently charged."  However, I see no reason why the jury could not be effectively instructed to "give individual consideration" to the evidence introduced against each defendant and to avoid finding Scotto guilty for acts committed by

Gammarano, especially where there are only two defendants on trial, a limited number of criminal acts alleged and where the potentially prejudicial evidence can be clearly distinguished by its dates. *Alessi,* 638 F.2d at 475.[30]  The allegations against Gammarano do not 'dwarf' those made against Scotto and any prejudice which may occur is of the type already anticipated by Rule 8 and curable by appropriate instructions to the jury.

Scotto also argues that the government intends to introduce evidence of the Gambino family's violent history, with an emphasis on the period from 1982 to 1992, when John Gotti, Jr. rose to power in the Gambino family amongst a series of brutal murders and other violent crimes.[31]  According to Scotto, evidence of events from this time period would be inadmissible had the government not alleged that Gammarano committed predicate criminal acts in 1982 and 1988,[32] and, accordingly, it would not be admissible against Scotto himself in a separate trial, since there is no allegation that Scotto committed any crimes prior to

---

[30] As I stated at oral argument, it will be appropriate for the government to make clear during the trial when evidence is being introduced against only one of the defendants.  Defendants may also propose language for the limiting instructions to be given to the jury.

[31] According to Scotto, the government frequently presents this type of "history lesson" in mafia trials and, in trials involving the Gambino family, usually refers to the murders of Paul Castellano and Thomas Bilotto, which supposedly paved the way for John Gotti, Jr.'s rise to power, and the retaliatory murder of Frank DeCicco, a Gotti loyalist, as well as other violent crimes.

[32] Scotto alleges that the government's motive in including the fourth and fifth predicate acts, which Gammarano has already pled guilty to, was to allow it to introduce evidence of other Gambino family crimes during that period.

1993.  According to Scotto, the 'shocking and inflammatory,'
nature this "eleven year parade of violence" would substantially
prejudice him, particularly since Scotto is not alleged to have
participated in anything like the violence that marked that
period.[33]

The government concedes that it will introduce evidence that
will demonstrate that the Gambino family was a criminal
enterprise during the period prior to Scotto's becoming a member
or associate of the RICO enterprise.[34]  However, such evidence
would be admissible against Scotto even if the trial were
severed.  To prove that a defendant is guilty of racketeering
activity, "the government must prove an enterprise and a pattern
of racketeering activity as elements of a RICO violation." *U.S.
v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) (addressing
defendant's argument that the introduction of evidence about the
violent activities of other members of a criminal organization
created spillover prejudice).  "Proof of these elements may well
entail evidence of numerous criminal acts by a variety of
persons, and each defendant in a RICO case may reasonably claim

---

[33] According to Scotto, it is "unrealistic to presume that a limiting
instruction would protect [him] from the prejudicial impact of 11 years worth
of inflammatory evidence."

[34] The government notes that it does not "plan to present extensive
details of murders with which neither Gammarano or Scotto were personally
involved."  The relevance of such evidence, its probative value, and potential
prejudice can be evaluated on objection by defendants at the time it is
offered.

no direct participation in some of those acts.  Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant." *Id.* ("In the present case, the evidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise."); *see also U.S. v. Triumph Capital Group, Inc.,* 260 F.Supp.2d 432, 438 (D.Conn. 2002) ("Moreover, in RICO prosecutions, there is little danger of prejudice from spillover evidence because evidence is generally admissible against all RICO defendants to prove the existence and nature of the racketeering enterprise and the relationship and continuity of the predicate acts which is needed to establish a pattern of racketeering.").  Indeed, courts in this circuit frequently admit evidence of uncharged acts "to prove the existence of the criminal RICO enterprise in which the defendant participated," and "[t]his circuit has approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families." *U.S. v. Matera*, 2007 WL 1546018, at *3-4 (2d Cir. 2007) (internal quotations and citations omitted).

In the present case, although Scotto himself is not charged with any acts of murder or similar violence, he is alleged to be a member of the Gambino family, "an enterprise that allegedly

engaged in a pattern of racketeering activity." *U.S. v. Gotti*, 2004 WL 602689, at *7 (S.D.N.Y. 2004). While it is true that there is no allegation that Scotto himself was a member of the Gambino organization prior to 1993, evidence of its existence and activities prior to that date is admissible in a racketeering case against him since it tends to demonstrate the nature of the Gambino organization and that it engaged in a pattern of racketeering activity. *See DiNome,* 954 F.2d 839 at 843 ("'In some cases both the relatedness and the continuity necessary to show a RICO pattern may be proven through the nature of the RICO enterprise. For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise. The nature of the enterprise may also serve to show the threat of continuing activity. Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.'") (quoting *U.S. v. Indelicato*, 865 F.2d 1370, 1383-84 (2d Cir. 1989)). Therefore, "a separate trial would not shield [Scotto] from evidence of [these] acts that are relevant to prove both an enterprise and a pattern of racketeering under RICO." *Gotti*, 2004 WL 602689, at

*7.[35]  Accordingly, the motion to sever is denied.


## III. Bill of Particulars

Defendants move for the production of a "limited" bill of particulars.  Specifically, the defendants seek particularized information about (1) the identity of co-conspirator #1, co-conspirator #2, John Doe, and "others" who are alleged to have participated in the conduct described in the indictment;[36] (2) all locations where the crimes were allegedly committed;[37] and (3) the exact nature of the fraudulent acts committed in furtherance of the securities fraud conspiracy, which took place over the course of eight years.[38]

---

[35] Scotto cites *U.S. v. Johansen,* 56 F.3d 347 (2d Cir. 1995) in support of his argument.  In that case, multiple defendants who used the same middleman were charged with credit card fraud and tried together, but government could not demonstrate that petitioner was part of the violent conspiracy engaged in by the other defendants.  Accordingly, the Second Circuit found that, by failing to sever the trials, the district court invited the jury prejudicially to "consider [evidence of the other defendants'] brutality as evidence against [petitioner]." *Id.* at 352.  Since the evidence of past illegal activity can be admitted against Scotto, this precedent is not on point.  Moreover, Scotto himself is alleged to have been a member of the Gambino family and a part of the broader RICO enterprise. *See U.S. v. Scott*, 413 F.3d 1253, 1275-76 (10th Cir. 2005) (distinguishing *Johansen* on the grounds that the government could not show that defendant participated in the violent conspiracy, while "there is no question that Mr. Smith personally knew and worked in conjunction with the other members of [the criminal enterprise] named as RICO coconspirators in order to further the reputation and power of [that enterprise] through criminal conduct.")

[36] Except for racketeering act five, each predicate act alleges involvement of "others."

[37] Defendants note that the indictment charges that the crimes were committed in the Eastern District of New York and "elsewhere."

[38] Defendants note that the indictment charges, without specificity, that defendants employed manipulative and deceptive devices and contrivances; employed devices, schemes and artifices to defraud; made untrue statements of

"The court may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f).  The decision of "whether to grant a bill of particulars rests within the sound discretion of the district court." *U.S. v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (internal quotations omitted).  In exercising discretion under Rule 7(f), a court is guided by the purposes a bill of particulars is designed to serve, namely, to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *U.S. v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir. 1988) (noting that "[t]hese principles must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO.  With the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope.").

To obtain a bill of particulars, a defendant must show that "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres,* 901 F.2d at 234.  The test "is not whether the

material fact and omissions of material fact; and engaged in acts, practices and course of business which operated as a fraud on the investing public.  The indictment also refers to "the purchases and sales of securities" without specifying which securities were involved.

information sought would be useful to the defendant but rather whether it is necessary to a defense." *U.S. v. Sierra-Garcia*, 760 F.Supp. 252, 268 (E.D.N.Y. 1991). As the court noted in *U.S. v. Jimenez*, 824 F.Supp. 351 (S.D.N.Y. 1993):

> [A] bill of particulars serves merely to inform a defendant of the nature of the charge . . . . Accordingly, the Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories.

*Id*. at 363 (internal citations omitted); *see also U.S. v. Columbo*, 2006 WL 2012511, at *4 (S.D.N.Y. 2006) (noting that the bill of particulars is not to "function as an investigative tool for the defense"). The Second Circuit has also noted that even in cases where deficiencies in the indictment which might appear to call for a bill of particulars, those deficiencies can be cured by subsequent disclosures of the government: "a bill of particulars should not be granted where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *U.S. v. Torres,* 2006 WL 1982750, at *5 (E.D.N.Y. 2006)(citing *U.S. v. Walsh,* 194 F.3d 37, 47 (2d Cir. 1999)).

Requests in these categories are routinely denied. *See, e.g., Jimenez,* 824 F.Supp. at 363 (observing that requests for "whens" "wheres" and "with whoms" are routinely denied); *U.S. v.*

*Carroll,* 510 F.2d 507, 509 (2d Cir. 1975) (stating that "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge").

*Government Disclosures*

According to the government, and without dispute by defendants, a significant amount of evidence and information has already disclosed to defendants.  Among other things, the government has produced 20 audio recordings which relate to the extortion charged in racketeering act five; video surveillance of Gammarano at or near the Ravenite Social Club between 1988 and 1990; transcripts of Gammarano's guilty pleas from 1982 and 1995, relating to the fourth and fifth predicate acts; 18 audio recordings relating to the securities fraud conspiracy made by cooperating witness Salvatore Romano, a member of that conspiracy, including an audio recording of the meeting attended by Gammarano and Scotto at which the Jaguar deal was discussed; and "numerous" prison records relating to Gammarano.

The government has also produced a record of the 2005 testimony of Joseph Quattrochi, during which Quattrochi described "much of the securities fraud conspiracy" alleged in the

indictment, "including the conspiracy to extort Fiero."[39]  During

that testimony, Quattrochi explained how he and others sold

stocks to customers by lying about their real value and by

failing to disclose that he and Romano were being paid illegal

cash commissions on each sale.  According to Quattrochi, he,

Romano and others prevented customers from selling stocks they

purchased and those stocks later dropped in value and the

customers lost their investments.  Quattrochi also explained that

he and Romano reported to Gammarano and shared the proceeds of

their fraud with him in exchange for his protection and that

Gammarano participated directly in the fraud by providing $20,000

to help Romano start his securities business, causing threats of

violence to be directed at those who sought to interfere with the

conspiracy, and helping settle disputes that arose during the

course of the conspiracy.  Quattrochi also testified that Scotto

reported to Gammarano and that Scotto and Louis Mariani carried

out Gammarano's order to threaten Fiero.

At oral argument, the government stated that, with regard to

security fraud, they expected to introduce evidence about a "wide

ranging effort to defraud investors and the defendant's role as

[M]ob protection in that effort."  For this reason, according to

the government, the case is not a typical securities fraud case

---

[39] The government notes that defense counsel in this case also
represented defendants in the Gotti case and were present for Quattrochi's
testimony.

which relies heavily on documentation of financial information and that it is not withholding a "treasure trove" of such data. The government will have a witness testify about basic market concepts and will have charts showing the market prices of the relevant securities but will rely mostly on witnesses who will testify about the defendants' role in the conspiracy. To facilitate defendants' preparation, the government agreed to provide defendants with the names of all the companies it is aware of whose stock was impacted by the alleged securities fraud conspiracy and the time period during which the share prices of those companies was effected.

*Particulars of Co-Conspirators and Victims*

Defendants' first request is that the government identify unindicted co-conspirators and victim John Doe. The Second Circuit has upheld decisions by district courts both to grant such requests and to deny them and "[a] court considering a defendant's request for the identity of unindicted coconspirators must engage in a highly fact-specific inquiry" as to whether the information is needed by defendants to allow them to prepare for trial and prevent surprise. *U.S. v. Solomonyan*, 451 F.Supp.2d 626, 642 (S.D.N.Y. 2006) (Finding that "defendants in this case possess substantial information about the charges against them. While there are a large number of identified coconspirators, the

conspiracies alleged are not themselves complex.  Thus defendants
do not have the need, as compared, say, to defendants in an
intricate fraud conspiracy, to identify unnamed coconspirators in
order to piece together the nature of the charges against
them."); *See Torres*, 901 F.2d at 233-34 (upholding district
court's denial of request for "the identity of those other
persons 'known and unknown'").  In addition, the concern about
the safety of trial witnesses and possible attempts to obstruct
justice should be taken into account. *See U.S. v. Gotti,* 2004 WL
32858, at *9 (S.D.N.Y. 2004) ("The Government has a legitimate
concern about the safety of those individuals it intends to call
at trial, a factor that this Court takes into consideration.");
*U.S. v. Sindone*, 2002 WL 48604, at *1 (S.D.N.Y. 2002) (""The
stakes in a criminal case are high, and temptations of perjury,
subornation and intimidation are ever present.  The government is
not required to turn over information that will permit a
defendant to preview the government's case and tempt him . . . to
see to it that the government's proof is not presented.").[40]

---

[40] Defendants rely on *U.S. v Nachamie*, 91 F.Supp.2d 565 (S.D.N.Y. 2000),
where defendants were charged with Medicare fraud conspiracy.  There, the
court evaluated the following factors in deciding whether to grant a request
to reveal the identity of co-conspirators:

(1) the number of co-conspirators; (2) the duration and breadth of
the alleged conspiracy; (3) whether the Government otherwise has
provided adequate notice of the particulars; (4) the volume of
pretrial disclosure; (5) the potential danger to co-conspirators
and the nature of the alleged criminal conduct; and (6) the
potential harm to the Government's investigation. If there are a
large number of co-conspirators and a long-running conspiracy, a
defendant is more likely to be surprised by the identity of other

With regard to the first predicate act, the securities fraud conspiracy and the extortion of Fiero, the government has provided substantial information about the charge, in particular by producing the testimony of Quattrochi in which he outlined the nature of the securities fraud and the extortion, referred to the names of other co-conspirators, and explained how defendants participated in the scheme.[41]  In addition, the government has turned over audio recordings made by Romano, including one recording of the meeting which defendants attended to discuss the Jaguar entity, and will provide the names of the securities involved and the relevant dates.  Although this disclosure may not have revealed each and every participant in this conspiracy,

---

co-conspirators, whom he may never have met.  If the Government has failed to provide adequate notice of the particulars, or if the discovery has been voluminous, identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial.

91 F.Supp.2d at 572-73.  In holding that co-conspirators identities must be disclosed, the court emphasized that there were eight defendants and "an unknown number of unindicted co-conspirators" whom defendants had apparently never met and that the government turned over more than 200,000 documents regarding 2,000 Medicare claims for a conspiracy lasting over three years but "failed to give defendants adequate notice of the particular charges against [each one of] them."  In the present case, as discussed below, the government has already given defendants "adequate notice of the particular charges against them" and the government has stated that, contrary to defendants' contention, it will not be providing "voluminous" discovery.  In addition, as discussed below, this Court has a definite reason to be concerned about the safety of potential witnesses and, not including the securities fraud conspiracy, each of the predicate acts was of short duration and breadth. *See U.S. v. Falkowitz,* 214 F.Supp.2d 365 (S.D.N.Y. 2002) (applying *Nachamie* factors and requiring disclosure of co-conspirators' identities); *U.S. v. Solomonyan*, 451 F.Supp.2d 626 (S.D.N.Y. 2006) (noting the *Nachamie* factors and declining to require disclosure of co-conspirators' identities).

[41] As noted above, the government plans to prove that defendant provided "Mob protection" to the conspiracy.

defendants have been provided with sufficient information as to the nature of the conspiracy and their roles in it such that they can prepare for trial even without that level of detailed information.

The government has not provided any information regarding the second racketeering act, Gammarano's extortion of First Hanover Securities. However, the indictment and the government's subsequent filings make clear what it is that Gammarano is accused of, namely extortion through a threat of violence, and who the victim is, namely the partners of First Hanover Securities. Such information is sufficient to alert Gammarano to the specific charges against him and allow him to prepare for trial.[42]

The same is true for the third predicate act, the attempted extortion of John Doe. Although the government has apparently not disclosed any information with regard to this event in its pre-trial disclosures and continues to withhold the true name of the victim, the nature of the offense is sufficiently clear and limited such that there is no need to identify either John Doe or the "others" in order to alert Scotto about the specific offense

---

[42] Given that the alleged conspiracy took place over a short period of time and did not extend beyond these few victims, it is unlikely that there were co-conspirators whom Gammarano had not met.

with which he is charged and prevent surprise.[43]  Moreover, John

Doe will apparently testify at trial and, given the Gambino

family's history of obstruction of justice, there is good reason

to be concerned about disclosing his identity too far in advance

of trial.[44]

Finally, with regard to the fourth predicate act, the

---

[43] Defendants argue that the government is required to disclose the names of victims.  However, several courts in this district have denied motions to reveal the names of victims of racketeering acts. *See U.S. v. Sattar,* 272 F.Supp.2d 348, 375 (S.D.N.Y. 2003) ("[T]he type of conduct charged in the Indictment is sufficiently concrete and particular as to permit a reasonably focused investigation . . . . [Defendants'] requests are merely an impermissible attempt to compel the Government to provide the evidentiary details of its case.") (internal citations and quotations omitted); *Gotti,* 2004 WL 32858, at *8-9; *U.S. v. Baez,* 62 F.Supp.2d 557, 558-59 (D.Conn. 1999). The cases cited by defendants do not require an opposite conclusion. Both *U.S. v. Agone,* 302 F.Supp. 1258 (S.D.N.Y. 1969) and *U.S. v. Solovey,* 2005 WL 1279228 (W.D.N.Y. 2005) deal with motions to dismiss indictments, rather than motions for a bill of particulars, and dismiss the indictments on the grounds that "the class of possible victims has a substantial membership," making the indictment "excessively . . . uncertain" and leaving the prosecution free to fill in the "missing element" which the Grand Jury failed to specify. *Agone,* 302 F.Supp. at 1260-61; *Solovey,* 2005 WL 1279228, at *3.  In the present case, there is no such concern since the indictment alleges only one victim, who is known to the Grand Jury, so the prosecution is not free "to roam at large." *Agone,* 302 F.Supp. at 1261 (internal quotations omitted).  As for *U.S. v. Avellino,* 129 F.Supp.2d 214, 221 (E.D.N.Y. 2001), which states that if the government intends to present evidence about acts committed in furtherance of a charged conspiracy, it "must identify each of those acts by (1) giving a general description of the conduct involved (2) the identity of any of the named defendants who actually participated in the conduct (3) the identity of the victim and (4) the approximate date of such conduct," no other court has cited *Avellino* for the proposition that the identity of the victim must be disclosed, and, moreover, the *Avellino* court's comment is only dicta, as the court in that case had no occasion to consider the question as to whether the identity of the victim need be disclosed and whether there may be exceptions to such a rule.

[44] Given this documented history of violence and the fact that the indictment sufficiently notifies the defendant of the charges against him, I will not require the government, at this point, to make an *ex-parte* showing to demonstrate that protecting Doe's identity "outweighs Scotto's right to sufficiently notified of the charges against him," as defendant requests. However, as noted above, the government must disclose the identity of this witness at the Pre-Trial Conference or move to maintain the witnesses anonymity until closer to the trial date.  If the government moves to maintain anonymity and the motion is granted, the government must be prepared to provide particularly detailed Brady and Giglio material to defendants.

extortion conspiracy involving DeLuxe Homes, the government has provided the defense with transcripts of Gammarano's plea colloquy in which, according to the government, he admits to his participation. Even though the crime was committed 20 years ago, given that Gammarano himself admitted that he participated in that conspiracy, he is clearly sufficiently aware of the nature of the charges, and, to the extent he has forgotten some details, the transcript of the plea colloquy should refresh his recollection. Accordingly, there is no need for the government to particularize the "others" involved.[45]

*Location of Predicate Acts*

Defendants' second request is for the specific locations where the predicate acts were committed, in order to prevent surprise and ensure they have adequate notice of the charges against them. As noted above, such requests for specific location are routinely denied. Here, defendants have pointed to no specific reason why they need to know the specific locations where the predicate acts were committed, nor can I see how it is necessary to a defense given the clarity of the indictment, and the government's subsequent disclosures, which give the defendants notice of the specific acts of which they are accused.

---

[45] There are no unindicted co-conspirators alleged to have participated in the fifth predicate act. However, I note that Gammarano pled guilty to that crime as well and the government has provided defendants with a copy of his admissions.

*See Solomonyan,* 451 F.Supp.2d at 642 (Denying motion to identify locations listed as "elsewhere" and noting that "[i]t is not the function of a bill of particulars to allow defendants to preview the evidence or theory of the government's case . . . . The detailed Complaint, Indictment, and discovery materials already provided are sufficient to put [defendant] on notice of the nature of the charges against him and prepare for trial.") (internal citations and quotations omitted). Accordingly, the government need not disclose the location where the predicate acts were committed.

*Particulars of the Securities Fraud Conspiracy*

Defendants' third request is for particulars regarding the securities fraud conspiracy. According to defendants, since the conspiracy took place over eight years, they would be required to guess as to which of the "presumed multitude of stock and transactions the government will contend were fraudulent."

As discussed above, the government has already provided defendant with significant details about the nature of the conspiracy, the manner in which it proceeded, the participants, and at least one of the securities involved, GlobalNet, and will provide the names of the additional companies whose stock prices were impacted and the dates on which they were effected. Since the government's case-in-chief will focus on efforts to defraud

investors by illegally marketing stocks and preventing customers from selling, the case will rely primarily on witness testimony rather than the "barrage" of documentation involved in a typical securities fraud case.  Accordingly, with the information the government has already provided (or will produce forthwith), defendants have sufficient information about the allegations and the evidence to prepare for trial. *See U.S. v. Sattar*, 272 F.Supp.2d 348, 375 (S.D.N.Y. 2003) ("[T]his is not a case such as *United States v. Bin Laden*, 92 F.Supp.2d 225 (S.D.N.Y. 2000), in which the Government alleged 267 discrete criminal offenses, including 229 counts of murder and six conspiracies and in which the indictment included 144 overt acts charged in such general terms as to require seemingly unlimited research and investigation by the Defendants in an attempt to answer those charges.") (internal quotations omitted).

## Conclusion

For the reasons set forth above, (1) the government's motion for an anonymous and partially sequestered jury is granted; (2) defendant Scotto's motion for severance is denied; and (3) both defendants' motion for production of a bill of particulars is denied. The Clerk is directed to transmit a copy of the within to all parties.

SO ORDERED.


Dated :    Brooklyn, New York
           July 18, 2007

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge